1  **REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
2  mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
3  adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
Phone:  (949) 975-0512
5  Fax: (949) 208-2839

6  **LIFSHITZ & MILLER**
Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7  jml@jlclasslaw.com
821 Franklin Ave., Suite 209
8  Garden City, NY 11530
Phone: (516) 493-9780
9  Fax: (516) 280-7376

10  Attorneys for Plaintiff

11  **UNITED STATES DISTRICT COURT**

12  **NORTHERN DISTRICT OF CALIFORNIA**

13

14  BARBARA SUE SKLAR LIVING TRUST,
Derivatively on Behalf of Nominal Defendant
SUNRUN INC.
15

Case No: 3:17-cv-3743

16          Plaintiff,

**VERIFIED SHAREHOLDER DERIVATIVE**
**COMPLAINT FOR VIOLATION OF THE**
**FEDERAL SECURITIES LAWS**
17  v.

18  EDWARD FENSTER, RICHARD WONG,
LESLIE DACH, LYNN JURICH, STEVEN
VASSALLO, GERALD RISK, KATHERINE
19  AUGUST-DE WILDE and ROBERT PATRICK
KOMIN, JR.,
**Demand for Jury Trial**

20
          Defendants,
21  and,

22  SUNRUN INC.,

23          Nominal Defendant.

24

25

26

27

28

Plaintiff, the Barbara Sue Sklar Living Trust ("Plaintiff"), by and through its undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant Sunrun Inc. ("Sunrun" or the "Company"), against certain officers and members of the Company's Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Sunrun and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Sunrun's website; (c) review of the pleadings and other documents in the securities class actions captioned *Fink v. Sunrun Inc.*, Case No. 3:17-cv-2537 (N.D.Cal.), *Hall v. Sunrun Inc.*, Case No. 3:17-cv-2571 (N.D.Cal.) and *Sanogo v. Sunrun Inc., et al.*, Case No. 17-cv-2865 (N.D.Cal.) (collectively, the "Securities Class Actions"); and (d) review of other publicly available information concerning Sunrun and the Defendants.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Nominal Defendant Sunrun seeking to recover damages caused by Defendants' violations of the federal securities laws for causing the Company to issue false and misleading statements and/or omit material information in its financial and proxy statements from September 10, 2015 until the present (the "Relevant Period").[1]

2. Sunrun engages in the design, development, installation, sale, ownership, and maintenance of residential solar energy systems in the United States. The Company markets and sells its products through direct channels, partner channels, mass media, digital media, canvassing, referral, retail, and field marketing.

3. Throughout the Relevant Period, Defendants caused the Company to issue materially false and misleading statements regarding the Company's business, operational and compliance policies. In particular, Defendants made false and misleading statements and/or failed to disclose,

---

[1] The false and misleading statements and material omissions were issued in the Company's public filings from approximately September 10, 2015 to May 3, 2017; however, the wrongs complained of herein continue through to the present as Sunrun's internal controls remain deficient.

among other things, that: (i) Sunrun failed to accurately disclose how many customers cancelled contracts after signing up for the Company's home-solar energy system; (ii) discovery of the inaccurate reporting of the number of cancelled home-solar energy system contacts would subject the Company to heightened regulatory scrutiny and potential civil sanctions; and (iii) as a result of the foregoing condcut, Sunrun's public statements were materially false and misleading and/or contained material omissions at all relevant times.

4.      On May 3, 2017, The Wall Street Journal issued an article entitled "SEC Probes Solar Companies Over Disclosure of Customer Cancellations."  According to the Securities Class Actions, The Wall Street Journal article stated, in pertinent part:

**SEC Probes Solar Companies Over Disclosure of Customer Cancellations**

Federal regulators are investigating whether solar-energy companies are masking how many customers they are losing, according to a person familiar with the matter.
The Securities and Exchange Commission is examining whether San Francisco-based Sunrun Inc. and Elon Musk's San Mateo, Calif.-based SolarCity Corp. have adequately disclosed how many customers have canceled contracts after signing up for a home solar-energy system, the person said.
Investors use that cancellation metric as one way to gauge the companies' health. Companies typically give customers a few days after signing a contract, or even up until the time of installation, to back out of a deal.

Some solar-energy companies have recently disclosed in public filings and earnings calls that increasing numbers of customers are canceling, but the companies have provided few details about the number of cancellations or their impact on the companies' business.

***The SEC recently issued a subpoena to Sunrun and interviewed current and former employees about the adequacy of its disclosures on account cancellations, said the person familiar with the investigation. The SEC is also looking at SolarCity, the person said.***

*      *      *

Cancellations grew to be so large at SolarCity that in early 2016, before the company was sold to Tesla, about half of its customers were backing out of contracts before solar panels could be installed, according to people familiar with the matter.

***At Sunrun, that cancellation figure grew to be as high as 40% earlier this year, according to people familiar with the figure.*** The cancellation rates were especially high among customers who were approached by salespeople at their doorstep or while they were shopping at big-box stores, these people say.

***The increase in cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40%, one of these people said.***

***Most of those figures weren't disclosed to investors. Instead, the companies have provided limited transparency.***

In its annual report in March, Sunrun said, "We have experienced increased customer cancellations in certain markets during 2016." The company does report how many systems it has installed net of cancellations, but it doesn't break out the number of cancellations.

SolarCity said the number of cancellations increased last year, but didn't say by how much.

Company executives, salespeople and homeowners blame the rise in cancellations on what they describe as aggressive sales tactics used by the industry.

Katarzyna Herink, 35, said she listened to a persuasive pitch from a Sunrun salesman at her house in Long Island, New York, last year and considered moving forward with installing solar panels on her roof.

Days later, the company told her she had signed a contract and they were going to start installation, without providing her any details about the cost or showing her the contract, Ms. Herink said.

When she complained, Sunrun told her a document she had initialed on the salesman's iPad during his initial visit constituted the contract, Ms. Herink said.

Ms. Herink immediately canceled the deal.

"We actually wanted to do it, but it was such a scary experience," she said. "Now we've decided to stay away from it."[2]

5.      On this news, the Company's share price dropped from a close of $5.21 per share on May 2, 2017 to close at $4.75 on May 3, 2017, a loss of $0.46 per share, or approximately 8%, on unusually heavy volume of over 3.3 million shares.

6.      Then, on May 22, 2017, *TheStreet* issued an article entitled, "Former Sunrun Managers Admit to Manipulating Sales Data,"[3] which stated, in pertinent part:

Former managers at solar energy company **Sunrun** (**RUN**) admitted to manipulating sales data, at the behest of their superiors, around the time of the company's initial public offering in 2015.

The managers said they were told to hold off on reporting hundreds of canceled contracts during a five month period in the middle of 2015.

---

[2] All emphasis added unless otherwise noted.

[3] Tony Owusu, *Former Sunrun Managers Admit to Manipulating Sales Data*, TheStreet (May 22, 2017),  *available at*  https://www.thestreet.com/story/14144456/1/former-sunrun-managers-admit-to-manipulating-sales-data.html?puc=yahoo&cm_ven=YAHOO&yptr=yahoo.

7.      Accordingly, as a result of Defendants' actions, the Company has suffered serious damages including, but not limited to, a decline in the Company's share price, loss of market capitalization, and severe loss of reputation and industry standing.

**JURISDICTION AND VENUE**

8.      This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. §1331 because one of the claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

9.      The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in California, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant Sunrun, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

11.      In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**THE PARTIES**

12.      Plaintiff, the Barbara Sue Sklar Living Trust ("Plaintiff"), was a shareholder of Sunrun at the time of the wrongdoing complained of herein, has continuously held shares in the Company throughout the Relevant Period, and continues to hold shares in Sunrun currently.

13.      Nominal Defendant Sunrun Inc. ("Sunrun" or the "Company") is a Delaware corporation with its principal executive offices located at 595 Market Street, 29th Floor, San Francisco, California 94105.  The Company's securities trade on the NASDAQ under the ticker symbol "RUN."

14.     Defendant Edward Fenster ("Fenster") co-founded the Company has been a director of the Company since 2007 and the Chairman since March 2014.  Defendant Fenster was the Chief Executive Officer ("CEO") of Sunrun from June 2008 to October 2012 and Co-CEO of Sunrun from October 2012 to March 2014.  The Company admits that defendant Fenster is not independent.  In his role as Chairman of the Board for the fiscal year ended December 31, 2016, defendant Fenster received $3,155,880 in total compensation.[4]

15.     Defendant Richard Wong ("Wong") has been a director of the Company since 2009 and is the Chairperson of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

16.     Defendant Leslie Dach ("Dach") has been a director of the Company since 2016 and is the Chairperson of the Nominating and Corporate Governance Committee.

17.     Defendant Lynn Jurich ("Jurich") co-founded the Company, has been Sunrun's CEO since March 2014, and a member of the Board since the Company was founded in 2007.  Defendant Jurich was the Co-CEO from October 2012 to March 2014 and the President of Sunrun from January 2009 to October 2012.  For the fiscal years ended December 31, 2016 and 2015, defendant Jurich received $3,414,760 and $845,840 in total compensation, respectively.  The Company admits that defendant Jurich is not independent.

18.     Defendant Steven Vassallo ("Vassallo") has been a director of the Company since 2009 and is a member of the Compensation Committee and the Audit Committee.  As of March 1, 2017, defendant Vassallo beneficially owned 10,894,509 shares of the Company's common stock, or approximately 10.42%, as a managing member of Foundation Capital Management Co. VI, L.L.C.[5]

---

[4] "Total compensation" includes salary, bonus, option and stock awards, non-equity incentive plan compensation and all other compensation.

[5] As of December 31, 2016, Foundation Capital VI, L.P. ("FC6") has shared voting and dispositive power with respect to 10,868,136 shares of Sunrun.  Foundation Capital VI Principals Fund, L.L.C. ("FC6P") has shared voting and dispositive power with respect to 10,868,136 shares of Sunrun. Foundation Capital Management Co. VI, L.L.C. ("FCM6") has shared voting and dispositive power with respect to 10,868,136 shares Sunrun. FCM6 serves as the sole general partner of FC6 and serves as the manager of FC6P. As such, FCM6 possesses shared voting and dispositive power over the shares held by FC6 and FC6P and may be deemed to have indirect beneficial ownership of the shares held by FC6 and FC6P. The address for Foundation Capital is 250 Middlefield Road, Menlo Park, CA 94025.

19.    Defendant Gerald Risk ("Risk") has been a director of the Company since 2014 and is the Chairperson of the Audit Committee.  The Company lists defendant Risk as the Financial Expert on the Board.

20.    Defendant Katherine August-de Wilde ("Wilde") has been a director of the Company since 2016 and is a member of the Compensation Committee and the Audit Committee.

21.    Defendants Fenster, Wong, Dach, Jurich, Vassallo, Risk and Wilde are collectively referred to herein as the "Director Defendants."

22.    Defendant Robert Patrick Komin, Jr. ("Komin") has been the Chief Financial Officer ("CFO") of the Company since March 2015.

23.    The Director Defendants and defendant Komin are collectively referred to herein as the "Defendants."

<strong>SUBSTANTIVE ALLEGATIONS</strong>

<strong>Background of the Company</strong>

24.    Sunrun was founded in 2007 and engages in the design, development, installation sale, ownership and maintenance of residential solar energy systems.  The Company expanded its operations in 2015 and provided its solar service offerings to customers in fifteen states, including the District of Columbia, and sold solar energy panels and products to resellers throughout the United States.

25.    The Company provides its solar product offerings through a lease or a power purchase agreement ("PPA") and markets its solar products through three channels: (i) direct-to-consumer channel; (ii) solar partner channel (where Sunrun contracts with solar organizations that originate customers, procure and install solar energy systems on customers' homes on Sunrun's behalf); and (iii) relationships with recognized non-solar brands.  Sunrun's PPA agreements that provide solar service products to customers are 20-year contracts per customer.

**Defendants Cause the Company to Issue**

**False and Misleading Statements and/or Omit Material Information**

26.    On September 10, 2015, the Company filed a current report on Form 8-K with the SEC and issued a press release announcing the Company's financial results for the second quarter of 2015, which stated, in pertinent part:

**Second Quarter 2015 Operating Highlights**

- *61.2 MW booked*, increased 59% quarter-over-quarter and 70% year-over-year.
- 42.4 MW deployed, representing organic growth of 76% year-over-year.
- Cumulative MW deployed of 472.5 MW, an increase of 46% year-over-year.
- Quarterly NPV creation was $37.2 million, a 60% increase quarter-over-quarter.
- Pre-tax Project Value per watt was $5.00, compared to $5.02 in Q1 2015.
- Creation Cost per watt of $4.08 decreased $0.28, or 6% quarter-over-quarter.

\*      \*      \*

**Second Quarter 2015 GAAP Results**

Total revenue grew to $72.7 million in the second quarter of 2015 from $51.9 million in the second quarter of 2014.  Operating leases and incentives revenue grew 50% year-over-year to $34.5 million.  Solar energy systems and product sales were $38.2 million in the second quarter of 2015, an increase of 32% year-over-year.

Total cost of revenue was $61.7 million, an increase of 45% year-over-year. Total operating expenses were $118.9 million in the second quarter of 2015, up 44% year-over-year.

Net income attributable to common stockholders was $7.5 million in the second quarter of 2015, compared to a net loss of $18.0 million in the first quarter of 2015 and $17.2 million in the second quarter of 2014.

\*      \*      \*

**Guidance for Third Quarter and Full Year 2015**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For the third quarter of 2015, we expect 54 to 55 MW deployed, which represents 81% organic growth year-over-year at the midpoint. For the full year 2015, we currently forecast MW deployed in the range of 205 MW.

27.    Also in the September 10, 2015 press release, defendant Jurich, the Company's CEO, stated:

2015 has been an exciting year for Sunrun.  ***We gained momentum towards our goal of creating the industry's most valuable and satisfied*** customer ***base…We ended the quarter with approximately 87,000 customers and a 60% increase in our quarterly NPV to $37.2 million***, which we achieved through accelerated reductions in creation costs.

28.    On September 15, 2015, the Company filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"), in which the Company reported net income of $7.54 million, or $0 per diluted share, on revenue of $72.69 million.

29.    The Q2 2015 10-Q further stated, in pertinent part:

**Operating Activities**

For the six months ended June 30, 2015, we used $44.6 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the six months ended June 30, 2015, we had an increase in deferred revenue of approximately $20.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $67.1 million from our net loss excluding non-cash and non-operating items. Net changes in working capital resulted in an inflow of cash of $2.2 million.

30.    The Q2 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Jurich and Komin, which stated that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.    On November 12, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of 2015.  The press release stated, in pertinent part:

**Sunrun Reports Third Quarter 2015 Financial Results**

***MW Booked Growth of 115% Year-Over-Year***
*Quarterly NPV Creation of $49.5 million, a 112% Increase from Q1 2015*
*Creation Costs per Watt Decreased $0.61 or 14% from Q1 2015*
*528 MW Cumulatively Deployed*

Third Quarter 2015 Operating Highlights

- *94.5 MW booked*, an increase of 54% quarter-over-quarter and 115% year-over-year.
- 55.7 MW deployed, representing 85% organic growth year-over-year.
- Cumulative MW deployed of 528.2 MW.
- Quarterly NPV creation was $49.5 million, an increase of 33% quarter-over-quarter.
- Pre-tax Project Value per watt was $4.70, compared to $5.00 in the prior quarter.
- Creation Cost per watt of $3.75 decreased $0.33, or 8% quarter-over-quarter.

*        *        *

**Guidance for Full Year 2015**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For the full year 2015, we expect MW deployed of approximately 205, which represents 79% organic growth year-over-year.

32.     In the November 12, 2015 press release, defendant Jurich stated:

Our NPV growth in the third quarter demonstrates our ongoing focus on value creation…***Successful execution on MW deployed and bookings growth*** means we are poised to continue our strong growth in 2016. We recently added our 100,000th solar customer, a new milestone as we rapidly add to the nation's second largest residential solar fleet.

33.     On November 13, 2015, the Company filed its quarterly report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), in which the Company reported a net loss of $2.77 million, or $0.41 per diluted share, on revenue of $82.60 million.

34.     The Q3 2015 10-Q further stated, in pertinent part:

**Operating Activities**

For the nine months ended September 30, 2015, we used $71.9 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the nine months ended September 30, 2015, we had an increase in deferred revenue of approximately $31.9 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $116.0 million from our net loss excluding non-cash and nonoperating items. Net changes in working capital resulted in an inflow of cash of $12.2 million.

35.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by defendants Jurich and Komin, which stated that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

1      36.    On March 10, 2016, the Company issued a press release and filed a current report on

2 Form 8-K with the SEC announcing the Company's fourth quarter and full year 2015 financial results.

3 The March 10, 2016 press release stated, in pertinent part:

4     **Sunrun Reports Fourth Quarter and Full Year 2015 Financial Results**

5     **Deployments Grow Almost 2X and Creation Cost is Down 17% since Q1 2015**

6     *Q4 MW Deployed Growth of 83% Year-Over-Year*
*Quarterly NPV Creation of $50 million, a 115% Increase from Q1 2015*
7     *596 MW Cumulatively Deployed*

8     **SAN FRANCISCO, March 10, 2016** – Sunrun (Nasdaq:RUN), the largest dedicated
residential solar company in the United States, today announced financial results for the
9     fourth quarter and full year ended December 31, 2015.

10     **Fourth Quarter 2015 Operating Highlights**

11        •  ***80 MW booked***, an increase of 117% year-over-year.
       •  68 MW deployed, representing 83% growth year-over-year.
12        •  Cumulative MW deployed of 596 MW.
       •  Quarterly NPV creation was $50 million, an increase of 1% quarter-over-
13           quarter.
       •  Pre-tax Project Value per watt was $4.50, compared to $4.70 in the prior
14           quarter.
       •  Creation Cost per watt of $3.64 decreased $0.11, or 3% quarter-over-quarter.
15

16     **Full Year 2015 Operating Highlights**

17        •  ***274 MW booked***, an increase of 85% organic growth year-over-year.
       •  203 MW deployed, representing 76% organic growth year-over-year.
18        •  Creation Cost per watt of $3.89.
       •  Aggregate NPV creation of $160 million.

19                                  *      *      *

20     **Guidance for Q1 and Full Year 2016**

21     The following statements are based on current expectations. These statements are
22     forward-looking and actual results may differ materially.

23     For 2016, we expect to deploy approximately 285 MW. We expect our Sunrun built
business to grow at a nearly 100% growth rate.

24     We will continue to target a $1 per watt of NPV across the full year despite
25     compression due to our exit from Nevada and capacity investments to support the
doubling of the direct business.

26     In Q1, we expect to deploy 56 MW. We have removed approximately 12 MW of
27     backlog from Nevada that would have been deployed in the quarter.

28

37.     On March 11, 2016, the Company filed its annual report on Form 10-K with the SEC reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K"), in which the Company reported a net loss of $15.02 million, or $0.07 per diluted share, on revenue of $99.64 million.

38.     In the 2015 10-K, the Company also reported for fiscal year 2015 a net loss of $28.25 million, or $0.96 per diluted share, on revenue of $304.61 million, compared to a net loss of $70.85 million, or $3.11 per diluted share, on revenue of $198.56 million for fiscal year 2014.

39.     The 2015 10-K further stated, in pertinent part:

**Operating Activities**

During 2015, we used $105.3 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During 2015, we had an increase in deferred revenue of approximately $47.7 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $159.3 million from our net loss excluding non-cash and non-operating items. Net changes in working capital, other than deferred revenue, resulted in an inflow of cash of $6.3 million.

40.     The 2015 10-K contained signed certifications pursuant to SOX by defendants Jurich and Komin, which stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41.     On April 8, 2016, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2016 annual meeting of shareholders to be held on May 20, 2016 (the "2016 Proxy").  In describing compensation for the Company's executive officers, the 2016 Proxy stated, in pertinent part:

The amounts in the Non-Equity Incentive Plan Compensation column for 2014 represents the amounts earned and payable under the 2014 bonus plan[6], all of which were paid in 2015. The amounts reported for 2015 represent the amounts earned and payable under the 2015 bonus plan[7], all of which were paid in 2016. Our Board of Directors formally adopted an Annual Incentive Plan (AIP) for our executives in December 2014….

---

[6] *See* 2014 Equity Incentive Plan. Form S-1, Ex. 10.4, filed on June 25, 2015 (the "2014 bonus plan").

[7] *See* 2015 Equity Incentive Plan. Form S-1/A, Ex. 10.2, filed on July 22, 2015 (the "2015 bonus plan").

42.     The 2016 Proxy represented that under the "2014 bonus plan" and "2015 bonus plan" adopted by the Company's Board, Sunrun awarded its executive officers approximately $1,123,454 in non-equity incentive plan compensation between 2014 and 2015.

43.     One of the purposes of the 2014 bonus plan was to "provide additional incentive to Employees [and] Directors…."  The 2014 bonus plan permits the grant of incentive stock options, nonstatutory stock options, stock appreciation rights, restricted stock and restricted stock units.  The 2016 Proxy refers only to the "2014 bonus plan," but does not disclose which type of awards were given out under the 2014 bonus plan and whether the named executive officers received a combination of the different awards permitted under the 2014 bonus plan.

44.     The 2016 Proxy also stated, "[f]or the 2015 bonus plan, payments were awarded based on achievement against the key company metrics for 2015."  The 2016 Proxy failed to described which "key company metrics" were purportedly met that caused the Company and the Board to award payments under the 2015 bonus plan.

45.     The 2016 Proxy also discloses that the Company paid Tom Holland, then President of Sunrun, $520,825 in stock awards and Paul Winnowski, then Chief Operating Officer of Sunrun, $142,500 in stock awards.  In connection with the award to Holland, the 2016 Proxy states that the award is "inclusive of any performance based RSU [restricted stock unit] grant…."  In connection with the award to Winnowski, the 2016 Proxy states that "the amount shown represents a performance based RSU grant…."

46.     In connection with the awards received by the Company's directors and/or named executive officers for 2014 and 2015, the 2016 Proxy failed to disclose material information concerning, *inter alia*, that Sunrun failed to adequately disclose how many customers cancelled contracts after signing up for the Company's home-solar energy system and in turn, that the Company lacked effective internal controls.  The 2016 Proxy omitted material information concerning the Company's true performance, which is tied directly to the directors' and officers' compensation.

47.     On May 12, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the first quarter of 2016 which stated, in pertinent part:

**Sunrun Reports First Quarter 2016 Financial Results**

*Revenues of $99 million*
*MW Deployed Growth of 63% Year-Over-Year*
*Cumulative 656 MW Deployed*

SAN FRANCISCO, May 12, 2016, Sunrun (Nasdaq:RUN), the largest dedicated residential solar company in the United States, today announced financial results for the first quarter ended March 31, 2016.

**First Quarter 2016 Operating Highlights**

- Total deployments of 60 MW, an increase of 63% year-over-year.  Sunrun-built deployments grew 148% year-over-year
- Cumulative MW deployed of 656 MW.
- Pre-tax Project Value per watt was $4.51, flat with Q4 2015.
- Pro forma Creation Cost (excluding one-time items related to Nevada exit) per watt of $4.11 decreased $0.25, or 6% year-over-year.

**Guidance for Q2 and Full Year 2016**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For 2016, we expect deployments of approximately 285 MW but we will focus primarily on delivering NPV of above $1 per watt in the second half of the year.  We believe this NPV growth is supported by expected growth rates of nearly 100% in our Sunrun built business, which is double the market growth rate and lower unit level creation costs.

In Q2, we expect to deploy approximately 60 MW.


48.    On May 13, 2016, the Company filed its quarterly report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"), in which the Company reported net income of $13.13 million, or $0.13 per diluted share, on revenue of $98.74 million, compared to a net loss of $18 million, or $0.74 per diluted share, on revenue of $49.68 million for the same period in the prior year.

49.    The Q1 2016 10-Q further stated, in pertinent part:

**Operating Activities**

During the three months ended March 31, 2016, we used $77.4 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the three months ended March 31, 2016, we had an increase in deferred revenue of approximately $5.6 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $48.5 million from our net loss excluding non-cash

and nonoperating items. Changes in inventory resulted in a cash outflow of $23.3 million. Changes in working capital, other than deferred revenue and inventory, resulted in an outflow of cash of $11.2 million.

50.   The Q1 2016 10-Q contained signed certifications pursuant to SOX by defendants Jurich and Komin, which stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.   On August 11, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of 2016. The press release stated, in pertinent part:

**Sunrun Reports Second Quarter 2016 Financial Results**

*Revenues of $123 million*
*Net Income of $33 million*
*Q2 MW Deployed Growth of 54% Year-Over-Year*
*Cumulative 721 MW Deployed*

SAN FRANCISCO, August 11, 2016, Sunrun (Nasdaq: RUN), the largest dedicated residential solar company in the United States, today announced financial results for the second quarter ended June 30, 2016.

**Second Quarter 2016 Operating Highlights**

- Total deployments of 65 MW, an increase of 54% year-over-year. Sunrun-built deployments grew 128% year-over-year.
- Cumulative MW deployed of 721 MW.
- Pre-tax Project Value per watt increased to $4.61 from $4.51 in the prior quarter.
- Creation Cost per watt improved by $0.44, or 11% from Q1 2016.

\*         \*         \*

**Guidance for Q3 and Full Year 2016**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For 2016, we expect deployments in the range of 270 to 280 MW, focusing primarily on delivering NPV of above $1 per watt in the second half of the year.

In Q3, we expect to deploy 72 MW.

52.   Also on August 11, 2016, Sunrun filed a quarterly report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"), in which the Company reported net income of $32.64 million, or $0.31 per diluted share,

on revenue of $122.54 million, compared to net income of $7.54 million, or $0 per diluted share, on

revenue of $72.69 million for the same period in the prior year.

53.    The Q2 2016 10-Q further stated, in pertinent part:

**Operating Activities**

During the six months ended June 30, 2016, we used $98.4 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During the six months ended June 30, 2016, we had an increase in deferred revenue of approximately $3.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $79.3 million from our net loss excluding non-cash and non-operating items. Changes in inventory resulted in a cash outflow of $16.8 million. Changes in working capital, other than deferred revenue and inventory, resulted in an outflow of cash of $5.6 million.

54.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by defendants Jurich

and Komin, which stated that the financial information contained in the Q2 2016 10-Q was accurate

and disclosed any material changes to the Company's internal control over financial reporting.

55.    On November 10, 2016, the Company issued a press release and filed a current report on

Form 8-K with the SEC announcing the Company's financial results for the third quarter of 2016.  The

November 10, 2016 press release stated, in pertinent part:

**Sunrun Reports Third Quarter 2016 Financial Results**

*Revenues of $112 million, 36% Year-Over-Year Growth*
*Raising deployment guidance for 2016 to 285 MW, 40% Year-Over-Year Growth*

SAN FRANCISCO, November 10, 2016, Sunrun (Nasdaq: RUN), the largest dedicated residential solar company in the United States, today announced financial results for the third quarter ended September 30, 2016.

**Third Quarter 2016 Operating Highlights**

- Total deployments of 80 MW, an increase of 43% year-over-year.
- Net Present Value created of $76 million, an increase of 53% year-over-year.
- Creation Cost per watt improved by $0.38, or 10% from Q3 2015.
- Cumulative MW deployed of 801 MW.

\*      \*      \*

**Guidance for Q4 and Full Year 2016**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

In Q4, we expect to deploy approximately 80 MW. As such, for full year 2016, we are raising deployment guidance from 270 to 280 MW to approximately 285 MW.

56.     Also on November 10, 2016, Sunrun filed a quarterly report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"), in which the Company reported net income of $16.88 million, or $0.16 per diluted share, on revenue of $112.03 million, compared to a net loss of $2.77 million, or $0.41 per diluted share, on revenue of $82.60 million for the same period in the prior year.

57.     The Q3 3016 10-Q stated, in pertinent part:

**Operating Activities**

During the nine months ended September 30, 2016, we used $127.2 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During the nine months ended September 30, 2016, we had an increase in deferred revenue of approximately $7.2 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $109.7 million from our net loss excluding non-cash and non-operating items. Changes in inventory resulted in a cash outflow of $14.6 million. Changes in working capital, other than deferred revenue and inventory, resulted in a cash outflow of $10.1 million.

58.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by defendants Jurich and Komin, which stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.     On March 8, 2017, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2016 financial results. The March 8, 2017 press release stated, in pertinent part:

**Sunrun Reports Fourth Quarter and Full Year 2016 Financial Results**

*Revenues of $454 million in 2016, 49% Year-Over-Year Growth*
*Net Present Value created of $213 million in 2016, an increase of 64% Year-Over-Year*
*Net Earning Assets reach $1 billion, 30% Year-Over-Year Growth*

SAN FRANCISCO, March 8, 2017, Sunrun (Nasdaq: RUN), the largest dedicated residential solar company in the United States, today announced financial results for the fourth quarter and full year ended December 31, 2016.

**Fourth Quarter 2016 Operating Highlights**

•   Total deployments of 77 MW, an increase of 13% year-over-year.

- Net Present Value created of $67 million, an increase of 47% year-over-year.
- Creation Cost per watt improved by $0.31, or 8% from Q4 2015.

**Full Year 2016 Operating Highlights**

- Total deployments of 282 MW, an increase of 39% year-over-year.
- Net Present Value created of $213 million, an increase of 64% year-over-year.
- Creation Cost per watt improved by $0.45, or 11% from full year 2015.
- Cumulative MW deployed of 879 MW.
- Net Earning Assets reached $1 billion, reflecting a 30% increase year-over-year.

*      *      *

**Guidance for Q1 and Full Year 2017**

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

In Q1, we expect to deploy approximately 69 MW, reflecting 15% year-over-year growth.

For the full year 2017, we expect to deploy 325 MWs, reflecting 15% year-over-year growth.

60.   Also on March 8, 2017, the Company filed its annual report on Form 10-K with the SEC reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"), in which the Company reported net income of $29.03 million, or $0.27 per diluted share, on revenue of $120.58 million, compared to a net loss of $15.02 million, or $0.07 per diluted share, on revenue of $99.64 million for the same period in the prior year.

61.   In the 2016 10-K, the Company reported net income of $91.69 million, or $0.87 per diluted share, on revenue of $453.90 million, compared to a net loss of $28.25 million, or $0.96 per diluted share, on revenue of $304.61 million for fiscal year 2015.

62.   The 2016 10-K further stated, in pertinent part:

**Operating Activities**

During 2016, we used $150.5 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During 2016, we had an increase in deferred revenue of approximately $10.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $132.2 million from our net loss excluding non-cash and nonoperating items. Changes in accounts payable resulted in a cash outflow of $40.3 million. Changes in working capital, other than deferred revenue and accounts payable, resulted in a cash inflow of $11.7 million.

63.     The 2016 10-K contained signed certifications pursuant to SOX by defendants Jurich and Komin, which stated that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64.     On April 13, 2017, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2017 annual meeting of shareholders to be held on May 26, 2017 (the "2017 Proxy").  In describing compensation for the Company's executive officers, the 2017 Proxy stated, in pertinent part:

> The amounts in the Non-Equity Incentive Plan Compensation column for 2015 represent the amounts earned and payable under the 2015 bonus plan, all of which were paid in 2016.  The amounts reported for 2016 represent the amounts earned and payable under the 2016 bonus plan, all of which were paid in 2017. Our board of directors formally adopted an Annual Incentive Plan (AIP) for our executives in December 2014.  For the 2016 bonus plan, payments were awarded based on achievement against the key company metrics for 2016, including (without limitation) megawatts deployed, net present value and net promoter scores.

65.     The 2017 Proxy represented that under the 2015 bonus plan adopted by the Company and the Board, as described above, Sunrun awarded its executive officers approximately $1 million in non-equity incentive plan compensation in 2016.

66.     In connection with the awards received by the Company's directors and/or named executive officers for 2016, the 2017 Proxy failed to disclose material information concerning, *inter alia*, that Sunrun failed to adequately disclose how many customers cancelled contracts after signing up for the Company's home-solar energy system and in turn, that the Company lacked effective internal controls.  The 2017 Proxy omitted material information concerning the Company's true performance, which is tied directly to the directors' and officers' compensation.

67.     Throughout the Relevant Period, Defendants caused the Company to issue materially false and misleading statements regarding the Company's business, operational and compliance policies. In particular, Defendants made false and misleading statements and/or failed to disclose, among other things, that: (i) Sunrun failed to accurately disclose how many customers cancelled contracts after signing up for the Company's home-solar energy system; (ii) discovery of the inaccurate reporting of the number of cancelled home-solar energy system contacts would subject the Company to heightened regulatory scrutiny and potential civil sanctions; and (iii) as a result of the

foregoing condcut, Sunrun's public statements were materially false and misleading and/or contained material omissions at all relevant times.

### The Truth Begins to Emerge

68.    On May 3, 2017, The Wall Street Journal issued an article entitled, "SEC Probes Solar Companies Over Disclosure of Customer Cancellations."  The Wall Street Journal article stated, in pertinent part:

**SEC Probes Solar Companies Over Disclosure of Customer Cancellations**

Federal regulators are investigating whether solar-energy companies are masking how many customers they are losing, according to a person familiar with the matter.

The Securities and Exchange Commission is examining whether San Francisco-based Sunrun Inc. and Elon Musk's San Mateo, Calif.-based SolarCity Corp. have adequately disclosed how many customers have canceled contracts after signing up for a home solar-energy system, the person said.

Investors use that cancellation metric as one way to gauge the companies' health. Companies typically give customers a few days after signing a contract, or even up until the time of installation, to back out of a deal.

Some solar-energy companies have recently disclosed in public filings and earnings calls that increasing numbers of customers are canceling, but the companies have provided few details about the number of cancellations or their impact on the companies' business.

***The SEC recently issued a subpoena to Sunrun and interviewed current and former employees about the adequacy of its disclosures on account cancellations, said the person familiar with the investigation. The SEC is also looking at SolarCity, the person said.***

*             *             *

Cancellations grew to be so large at SolarCity that in early 2016, before the company was sold to Tesla, about half of its customers were backing out of contracts before solar panels could be installed, according to people familiar with the matter.

***At Sunrun, that cancellation figure grew to be as high as 40% earlier this year, according to people familiar with the figure.*** The cancellation rates were especially high among customers who were approached by salespeople at their doorstep or while they were shopping at big-box stores, these people say.

***The increase in cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40%, one of these people said.***

***Most of those figures weren't disclosed to investors. Instead, the companies have provided limited transparency.***

In its annual report in March, Sunrun said, "We have experienced increased customer cancellations in certain markets during 2016." The company does report how many

systems it has installed net of cancellations, but it doesn't break out the number of cancellations.

SolarCity said the number of cancellations increased last year, but didn't say by how much.

Company executives, salespeople and homeowners blame the rise in cancellations on what they describe as aggressive sales tactics used by the industry.

Katarzyna Herink, 35, said she listened to a persuasive pitch from a Sunrun salesman at her house in Long Island, New York, last year and considered moving forward with installing solar panels on her roof.

Days later, the company told her she had signed a contract and they were going to start installation, without providing her any details about the cost or showing her the contract, Ms. Herink said.

When she complained, Sunrun told her a document she had initialed on the salesman's iPad during his initial visit constituted the contract, Ms. Herink said.

Ms. Herink immediately canceled the deal.

"We actually wanted to do it, but it was such a scary experience," she said. "Now we've decided to stay away from it."

69.    On this news, Sunrun's share price dropped from a close of $5.21 per share on May 2, 2017 to close at $4.75 on May 3, 2017, a loss of $0.46 per share, or approximately 8%, on unusually heavy volume of over 3.3 million shares.

70.    On May 22, 2017, *TheStreet* issued an article entitled, "Former Sunrun Managers Admit to Manipulating Sales Data,"[8] which stated, in pertinent part:

Former managers at solar energy company **Sunrun** (**RUN**) admitted to manipulating sales data, at the behest of their superiors, around the time of the company's initial public offering in 2015.

The managers said they were told to hold off on reporting hundreds of canceled contracts during a five month period in the middle of 2015.

71.    Accordingly, as a result of Defendants' actions, the Company has suffered serious damages including, but not limited to, a decline in the Company's share price, loss of market capitalization, and severe loss of reputation and industry standing.

---

[8] Tony Owusu, *Former Sunrun Managers Admit to Manipulating Sales Data*, TheStreet (May 22, 2017), *available at* https://www.thestreet.com/story/14144456/1/former-sunrun-managers-admit-to-manipulating-sales-data.html?puc=yahoo&cm_ven=YAHOO&yptr=yahoo.

## DAMAGES TO THE COMPANY

72.     Sunrun has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' wrongdoing alleged herein, Sunrun has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a)  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

    b)  costs incurred defending against SEC, DOJ and other government investigations and litigation;

    c)  substantial loss of market capital;

    d)  costs already incurred and to be incurred defending the pending Securities Class Actions; and

    e)  any fines or other liability resulting from the Company's violations of federal law.

73.     In addition, Sunrun's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

74.     The wrongdoing complained of herein has irreparably damaged Sunrun's corporate image and goodwill.  For at least the foreseeable future, Sunrun will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sunrun's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of Sunrun to redress injuries suffered, and to be suffered, by Sunrun as a direct result of violations of federal securities laws by the Defendants.  Sunrun is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

76.    The Board of Sunrun, at the time this action was commenced, consisted of the following seven individuals: Fenster, Wong, Dach, Jurich, Vassallo, Risk and Wilde.

77.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Sunrun Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme to cause the Company to issue false and misleading statements and/or omit material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

78.    By participating in this course of conduct, the Director Defendants exposed the Company to damage and injury. Consequently, the Director Defendants face a substantial risk of liability for causing the Company to issue the materially misleading statements and/or material omissions, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

**Demand is Futile as to Defendant Jurich as an Employee-Director**

79.    Defendant Jurich co-founded the Company, has been a member of the Board since Sunrun was founded in 2007 and has been the CEO since March 2014.  In her role as CEO of Sunrun for the fiscal years ended December 31, 2016 and 2015, defendant Jurich received $3,414,760 and $845,840 in total compensation, respectively.  The Company does not claim that defendant Jurich is an independent director and because defendant Jurich derives significant income from, and her primary source of income is, her employment as CEO of Sunrun and her professional reputation is inextricably bound to her role at Sunrun, defendant Jurich is incapable of acting independently and demand is futile upon her.

**The Company Admits that Defendant Fenster is Not Independent**

80.    Defendant Fenster co-founded the Company has been a director of the Company since 2007 and the Chairman of the Board since March 2014.  In his role as Chairman of the Board for the fiscal year ended December 31, 2016, defendant Fenster received $3,155,880 in total compensation. The Company does not claim that defendant Fenster is an independent director and because defendant Fenster derives significant income from his employment as Chairman of Sunrun and his professional reputation is inextricably bound to his role at Sunrun, defendant Fenster is incapable of acting

1  independently and demand is futile upon him. Defendant Fenster was also the CEO of Sunrun from

2  Jun 2008 to October 2012 and Co-CEO from October 2012 to March 2014.

3  **Demand is Futile as to the Members of the Audit Committee**

4  81.  Demand is futile as to defendants Vassallo, Risk and Wilde (the "Audit Committee

5  Defendants") as members of the Audit Committee in their knowing failure to fulfill the responsibilities

6  defined in the Board's Audit Committee Charter[9] and oversee the Board's actions and reporting

7  practices.

8  82.  The Audit Committee Charter, adopted by the Board on November 6, 2015 and amended

9  on November 11, 2016, states that the purpose of the Audit Committee is "to assist the Board in

10  overseeing: [t]he Company's accounting and financial reporting processes and internal controls as well

11  as the audit and integrity of the Company's financial statements…." In particular, the Audit

12  Committee Defendants are responsible and required to review "[t]he Company's annual audited and

13  quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the

14  disclosures in 'Management's Discussion and Analysis of Financial Condition and Results of

15  Operations'…the reports and certifications regarding internal control over financial reporting and

16  disclosure controls and procedures…."

17  83.  Upon information and belief, in their capacity as members of the Audit Committee, the

18  Audit Committee Defendants were privy to specific information related to how many customers

19  cancelled contracts after signing up for the Company's home-solar energy system, which would

20  reasonably put them on notice of the misleading information being disseminated by the Defendants in

21  the Company's public filings.

22  84.  Sunrun's public filings concerning the Company's business and prospects moving

23  forward throughout the Relevant Period contained materially false and misleading information and/or

24  omitted material information concerning the true nature of the number of contracts being cancelled by

25  the Company's customers. In their capacity as members of the Audit Committee, the Audit

26

27  [9] *See* Amended and Restated Charter of the Audit Committee of the Board of Directors of Sunrun Inc. (adopted on November 6, 2015, amended on November 11, 2016), *available at* http://investors.sunrun.com/phoenix.zhtml?c=254007&p=irol-govHighlights (the "Audit Committee

28  Charter"). The Audit Committee Charter is incorporated herein by reference.

Committee Defendants were charged with ensuring that these reports did not contain such materially false and misleading information.  By allowing public documents to be disseminated with false and misleading information, the Audit Committee Defendants face a sufficiently substantial likelihood of liability so as to render them interested.

85.   Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Members of the Compensation Committee**

86.   Demand is futile as to defendants Wong, Vassallo and Wilde (the "Compensation Committee Defendants") as members of the Compensation Committee.  Pursuant to Sunrun's Compensation Committee Charter[10], the "purpose of the Compensation Committee…is to: [p]rovide oversight of the compensation of the Company's [CEO] and the executive officers of the Company who report to the CEO; [p]rovide oversight of the Company's compensation policies and plans and benefits programs, and overall compensation philosophy; [a]dminister the Company's equity compensation plans for its CEO, executive officers and other employees and the granting of equity awards pursuant to such plans or outside of such plans…."

87.   The Compensation Committee Defendants presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and approving executive officers' and directors' continued and excessive compensation.  In so doing, any demand upon the Compensation Committee Defendants is futile, and therefore excused.

**FIRST CAUSE OF ACTION**

**Against Defendants for Violations of Section 14(a)**

**of the Securities Exchange Act of 1934 and Rule 14a-9**

88.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

---

[10] *See* Charter of the Compensation Committee of the Board of Directors of Sunrun Inc. (adopted March 19, 2015, effective upon the effectiveness of the Registration Statement, 2015), *available at* http://media.corporate-ir.net/media_files/IROL/25/254007/cg/Compensation%20Committee %20C harter.pdf. The Compensation Committee Charter is incorporated herein by reference.

89.     Rule 14a-9 was enacted pursuant to § 14(a) of the Securities Exchange of 1934, and provides in relevant part:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading….

90.     In this case, the Company's 2016 and 2017 Proxy Statements violated § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder because they omitted material information regarding Defendants wrongful conduct, and included by reference materially false and misleading financial statements.

91.     The Company's 2016 and 2017 Proxy Statements incorporated by reference all of the Company's public filings over the previous year.

92.     Defendants caused the Company to issue the 2016 and 2017 Proxy Statements which contained false and misleading statements and/or failed to disclose material adverse information about the Company concerning, among other things, that: (i) Sunrun failed to adequately disclose how many customers cancelled contracts after signing up for the Company's home-solar energy system; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential civil sanctions; and (iii) as a result, Sunrun's public statements were materially false and misleading at all relevant times.

93.     In the exercise of reasonable care, Defendants should have known that the statements contained in the 2016 and 2017 Proxy Statements were materially false and misleading.

94.     The misrepresentations and omissions in the 2016 and 2017 Proxy Statements were material to Company shareholders in voting on each of these proxies.

95.     As a proximate result of Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements, the Company was damaged.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Sunrun and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Sunrun the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Sunrun and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sunrun and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Sunrun to nominate at least three independent candidates for election to the Board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

D.    Determining and awarding to Sunrun exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding Sunrun restitution from Defendants, and each of them;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated:      June 29, 2016                                    **REICH RADCLIFFE & HOOVER LLP**


                                                             By: /s/ Adam T. Hoover
                                                             Adam T. Hoover

                                                             **LIFSHITZ & MILLER**

                                                             Joshua M. Lifshitz
                                                             Edward Miller

                                                             Attorneys for Plaintiff

# Verification

Name *          barbara                          sklar

Company Name *          Sunrun Inc.

I hereby declare as follows:

I am a shareholder of the above referenced company and have continuously so owned the Company's common stock during the relevant period. Under penalties of perjury, I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.

Digital signature *                                                                        Clear

Date *          05/11/2017

REDACTED