**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (#319767)
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
fortunato@bespc.com

**HYNES & HERNANDEZ LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: 484.875.3116
mhynes@hh-lawfirm.com
lhernandez@hh-lawfirm.com

*Attorneys for Plaintiff Leonard Olsen*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

BARBARA SUE SKLAR LIVING TRUST,
Derivatively on Behalf of Nominal Defendant
SUNRUN INC.,

      Plaintiff,

      v.

EDWARD FENSTER, RICHARD WONG,
LESLIE DACH, LYNN JURICH, STEVEN
VASSALLO, GERALD RISK, KATHERINE
AUGUST-DE WILDE and ROBERT PATRICK
KOMIN, JR.,

      Defendants,

      and

SUNRUN INC.,

      Nominal Defendant.

Case No: 3:17-cv-03743-VC

**PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF**

Date: November 21, 2019
Time: 10:00 a.m.
Courtroom: 4, 17th Floor
Judge: Hon. Vince Chhabria

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL AND PROCEDURAL BACKGROUND............................................ 4

    A.  Factual Background............................................................................... 4

    B.  Procedural Background ......................................................................... 4

        1.  The *Sklar* Action........................................................................ 4

        2.  The *Olsen* Action....................................................................... 5

        3.  Settlement Negotiations in the Derivative Actions ..................... 6

    C.  Preliminary Approval and Notice to Shareholders................................ 6

III.  BENEFITS OF THE PROPOSED SETTLEMENT ............................................ 7

IV.  THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE SETTLEMENTS. 9

V.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND WARRANTS FINAL APPROVAL........................................................................ 10

    A.  The Substantial Benefits Conferred on the Company .................................. 10

    B.  The Risks, Costs and Delays of Continued Litigation .................................. 11

    C.  The Extent of Discovery and Stage of the Proceedings ................................ 15

    D.  The Settlement Was Negotiated At Arm's-Length By Experienced Counsel ............. 16

VI.  THE NEGOTIATED FEE AND EXPENSE AWARD IS FAIR AND REASONABLE AND SHOULD BE APPROVED ...................................................................... 17

    A.  Courts Favor a Negotiated Resolution of Fee Issues ................................... 17

    B.  The Agreed-to Fee Award Is Fair and Reasonable in Light  of the Substantial Benefits Achieved and Awards in Similar Cases ....................................................... 19

    C.  The Risks of Litigation.............................................................................. 21

    D.  The Skill Required and the Quality of Work ............................................... 21

    E.  The Contingent Nature of the Fee and Burdens on Derivative Plaintiffs' Counsel ..... 22

    F.  A Lodestar Cross-Check Confirms the Reasonableness of the Unopposed Fee and Expense Award........................................................................................ 23

VII.  THE INCENTIVE AWARDS SHOULD BE APPROVED............................................ 24

VIII.  CONCLUSION.......................................................................................................... 25

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE
SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

# TABLE OF AUTHORITIES

**Cases**

*In re Apple Computer, Inc. Derivative Litig.*,
   No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) ......... 11, 17

*Arnett v. Bank of Am., N.A.*,
   No. 3:11-cv-1372-SI, 2014 U.S. Dist. LEXIS 130903 (D. Or. Sept. 18, 2014) ....................... 24

*In re Biopure Corp. Derivative Litig.*,
   No. 1:04-cv-10177 (D. Mass. Sept. 15, 2009) ................................................................. 21

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ................................................................................. 15

*Buccallato v. AT&T Operations, Inc.*,
   No. C10-00463-LHK, 2011 U.S. Dist. LEXIS 85699 (N.D. Cal. June 30, 2011) ..................... 24

*Bushansky v. Carlucci, et al.*,
   No. 1:17-cv-12091 (D. Mass. Jan. 24, 2019) ................................................................. 21

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996) ........................................................................................... 3

*In re Cendant Corp., Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002) ................................................................................... 24

*Chrysler Corp. v. Dann*,
   223 A.2d 384 (Del. 1966) ................................................................................................ 20

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................ 9, 17, 19, 20

*Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ........................................................................................... 18

*In re Del Monte Foods Co. S'holders Litig.*,
   C.A. No. 6027-VCL, 2011 Del. Ch. LEXIS 94 (Del. Ch. June 27, 2011) ............................. 22

*Destefano v. Zynga, Inc.*,
   No. 12-cv-04007-JSC, 2016 U.S. Dist. LEXIS 17196 (N.D. Cal. Feb. 11, 2016) ................... 24

*In re Emerging Commc'ns S'holders Litig.*,
   C.A. No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) ..................................... 14

ii

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ............................................................................................... 17

*Hughes v. Microsoft Corp.*,
    No. C98-1646C, 2001 U.S. Dist. LEXIS 5976 (W.D. Wash. Mar. 21, 2001) ............................ 16

*In re Infinity Broad. Corp. S'holders Litig.*,
    802 A.2d 285 (Del. 2002) ...................................................................................... 19

*Krantz v. Ryan, et al.*,
    No. 1:01-cv-11464 (D. Mass. Sept. 7, 2005) ................................................................ 21

*In re Lloyd's Am. Tr. Fund Litig.*,
    96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ....................... 14

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ........................................................................ 2, 10, 19

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) .................................................................................. 15

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ....................................................................................... 19, 20

*In re MRV Commc'ns, Inc., Derivative Litig.*,
    No. CV 08-03800 GAF (MANx), 2013 U.S. Dist. LEXIS 86295
    (C.D. Cal. June 6, 2013) ....................................................................... 17, 19, 22, 23

*In re NVIDIA Corp. Derivative Litig.*,
    No. C-06-06110-SBA (JCS), 2008 U.S. Dist. LEXIS 117351
    (N.D. Cal. Dec. 19, 2008) ............................................................................ 2, 10, 20

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) .................................................................... 9, 10, 11, 15

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ..................................................................... 10, 11, 18

*In re PaineWebber P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................................. 14

*Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*,
    863 A.2d 772 (Del. Ch. 2004) ............................................................................... 13

*In re Rambus Inc. Derivative Litig.*,
    No. C 06-3513 JF (HRL), 2009 U.S. Dist. LEXIS 131845 (N.D. Cal. Jan. 20, 2009) .......... 20, 21

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE
SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

*Roberti v. OSI Sys.*,
  No. CV-13-09174 MWF (MRW), 2015 U.S. Dist. LEXIS 164312
  (C.D. Cal. Dec. 8, 2015) ............................................................................................. 17, 23

*Salley v. Debrabandere, et al.*,
  No. 17-cv-03777 (D. Md. Feb. 1, 2019) ......................................................................... 21

*Seinfeld v. Coker*,
  847 A.2d 330 (Del. Ch. 2000) ........................................................................................ 23

*Seinfeld v. Robinson*,
  246 A.D.2d 291 (N.Y. App. 1st Dep't 1998) ................................................................... 20

*Steiner v. Am. Broad. Co.*,
  248 Fed. App'x 780 (9th Cir. 2007) ............................................................................... 24

*Sugarland Indus., Inc. v. Thomas*,
  420 A.2d 142 (Del. 1980) ............................................................................................... 19

*Sved v. Chadwick*,
  783 F. Supp. 2d 851 (N.D. Tex. 2009) ............................................................................ 15

*Tharp v. Acacia Commc'ns, Inc., et al.*,
  No. 1:17-cv-11504 (D. Mass. Jan. 23, 2019) .................................................................. 21

*Unite Nat'l Ret. Fund v. Watts*,
  C.A. No. 04-CV-3606 (DMC), 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 27, 2005) ............. 11

*United States v. McInnes*,
  556 F.2d 436 (9th Cir. 1977) ............................................................................................ 9

*Villanueva v. Morpho Detection, Inc.*,
  No. 13-cv-05390-HSG, 2015 U.S. Dist. LEXIS 106183 (N.D. Cal. Aug. 12, 2015) ................. 16

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ................................................................................... 23, 24

*Wilfred v. Modany, et al.*,
  C.A. No. 13-cv-3110 (S.D.N.Y. May 8, 2013) ................................................................ 21

*Williams v. Nuti, et al.*,
  No. 1:13-cv-01400-SCJ (N.D. Ga. Apr. 8, 2014) ............................................................ 21

*In re Xoma Corp. Sec. Litig.*,
  No. C-91-2252 TEH, 1992 U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ...................... 10

iv

*Young v. Polo Retail, LLC,*
    No. C-02-4546 VRW, 2007 U.S. Dist. LEXIS 27269 (N.D. Cal. Mar. 28, 2007). .................... 23

**Statutes**

8 *Del. C.* § 220 ....................................................................................................................... 5

8 Delaware Code Annotated § 102(b)(7) ...................................................................................... 13

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE
SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on November 21, 2019 at 10:00 a.m., Plaintiff Barbara Sue Sklar Living Trust ("Sklar") and Plaintiff Leonard Olsen ("Olsen" and collectively with Sklar, "Derivative Plaintiffs")[1] will move before the Honorable Vince Chhabria, United States District Court Judge, at the United States District Court for the Northern District of California, Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, for entry of an order to grant final approval of the Derivative Settlement and Fee and Expense Award set forth in the Stipulation. The Settlement resolves the shareholder derivative claims brought on behalf of Nominal Defendant Sunrun Inc. ("Sunrun" or the "Company") in the Derivative Actions.

The Motion is based on the accompanying Memorandum of Points and Authorities in Support of Unopposed Motion for Final Approval of Derivative Settlement and Fee and Expense Award ("Memorandum"); the Stipulation; the Declaration of Michael J. Hynes in Support of Plaintiffs' Unopposed Motion for Final Approval of Derivative Settlement and Fee and Expense Award ("Hynes Decl."), a proposed order granting this Motion (Hynes Decl., Ex. 1), and such additional evidence or argument as may be required by the Court.

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

Should the Settlement entered into between the Derivative Plaintiffs and Derivative Defendants be granted final approval and judgment entered thereon?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Derivative Plaintiffs hereby submit this memorandum in support of their Unopposed Motion for Final Approval of Derivative Settlement and Fee and Expense Award with respect to

---

[1] Unless otherwise noted, all capitalized terms shall have the same definition as set forth in the Second Amended and Restated Stipulation and Agreement of Settlement dated September 5, 2019 (the "Stipulation" or "Stip."). Dkt. No. 38.

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

the shareholder derivative claims brought on behalf of Nominal Defendant Sunrun. Derivative Plaintiffs request entry of the Judgment approving the Settlement and Dismissing the Claims with Prejudice. A proposed judgment is submitted herewith. On September 16, 2019, the Court granted preliminary approval of the Derivative Settlement and approved the Notice of the Derivative Settlement to Current Sunrun Stockholders, which was duly provided. No Current Sunrun Stockholder filed an objection to the Settlement or Fee and Expense Award. Hynes Decl., ¶ 7.

The Settlement is the product of extensive, arm's-length negotiations among Derivative Plaintiffs, the Individual Defendants, and Nominal Defendant Sunrun (collectively, the "Settling Parties"). *Id*. at ¶ 8. Pursuant to the Settlement, Sunrun agreed to adopt and/or enact important corporate governance reforms at both the Board of Directors (the "Board") and senior management levels that will leave Sunrun a better-governed company with stronger internal controls and greater Board oversight into such important issues as Company performance, prospects, and customer experience. *See* Stip., § V(2.1); Hynes Decl., ¶ 9. Taken together, the corporate governance reforms will significantly enhance shareholder value by improving Sunrun's corporate governance and internal controls, particularly with respect to customer satisfaction, and by helping to restore Sunrun's credibility in the capital markets, and to capture the premium investors pay for strong corporate governance. *See* Hynes Decl., ¶ 10. This is a direct and meaningful benefit to both Sunrun and Current Sunrun Stockholders. *See* Hynes Decl., ¶ 11. These substantial benefits fully justify final approval. *See, e.g., Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short- term, than the dollar amount of any likely judgment").[2]

---

[2] *See also In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 U.S. Dist. LEXIS 117351, at *9-10 (N.D. Cal. Dec. 19, 2008) ("As corporate debacles such as Enron, Tyco

In agreeing to the Settlement, Derivative Plaintiffs have taken into account the certainty of the substantial benefit to the Company of the corporate governance reforms achieved, weighed against the significant uncertainties associated with continuing this risky, complex litigation. The Settlement's fairness is particularly evident when weighed against the substantial risks, costs, and delays that would be entailed in attempting to improve on the result through further litigation. While Derivative Plaintiffs believe their claims have merit, they recognize that their attempt to hold Sunrun's officers and directors liable for conscious disregard of their duty of oversight would require them to prevail on challenging claims in corporate law. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968-70 (Del. Ch. 1996).

In recognition of the substantial benefits conferred by Derivative Plaintiffs' Counsel on the Company, Derivative Defendants and Derivative Plaintiffs' Counsel negotiated the amount of attorneys' fees and expenses that Derivative Defendants' insurer would pay to Derivative Plaintiffs' Counsel. As a result of those negotiations, the Company's insurer, on behalf of Derivative Defendants, has agreed to pay Derivative Plaintiffs' Counsel $280,000 to compensate Derivative Plaintiffs' Counsel for their fees and litigation expenses (the "Fee and Expense Award"). This amount was negotiated by the Settling Parties at arm's-length, separate, and apart from the material terms of the Settlement and is fair and reasonable in light of the substantial benefits achieved by the Settlement. Hynes Decl., ¶ 16; *see also* Stip. at § V(5.1).

Given the results obtained for Sunrun, Derivative Plaintiffs respectfully submit that the Court should approve the Settlement, including the Fee and Expense Award negotiated between the Settling Parties. Accordingly, Derivative Plaintiffs respectfully request that the Court enter the Judgment.

---

and WorldCom demonstrate, strong corporate governance is fundamental to the economic well-being and success of a corporation.").

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Sunrun engages in the design, development, installation, sale, ownership, and maintenance of residential solar energy systems in the United States. The Company markets and sells its products through direct channels, partner channels, mass media, digital media, canvassing, referral, retail, and field marketing. In May 2017, issues arose concerning the adequacy of the Company's prior disclosures regarding customer account cancellations. Specifically, media sources alleged that Sunrun senior executives directed managers to stop the reporting of customer contract cancellations. By deferring reporting these cancellations, Sunrun increased its reported Megawatts Booked, thereby inflating measures of its performance and prospects.

### B.    Procedural Background

#### 1.    The *Sklar* Action

On June 29, 2017, Plaintiff Sklar filed *Barbara Sue Sklar Living Trust v. Fenster, et al.*, Case No. 3:17-cv-3743 (the "*Sklar*" Action"), in this Court against certain of the Company's directors and officers and on behalf of the Company. The complaint generally alleged that the defendants violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by making false or misleading statements in connection with public filings, including proxy statements, made between September 10, 2015, and May 3, 2017, regarding the number of customers who cancelled contracts after signing up for the Company's home solar energy system. On August 8, 2017, the parties to the *Sklar* Action stipulated to extend the deadline for Derivative Defendants to answer the *Sklar* complaint pending an outcome on the motion to dismiss in the Securities Class Action.[3]

---

[3] "Securities Class Action" refers to the securities class action lawsuit captioned, *In re Sunrun Inc. Securities Litigation*, Case No. 3:17-cv-02537-VC, that was filed in this Court.

### 2.    The *Olsen* Action

In July 2017, Plaintiff Olsen made a demand pursuant to 8 *Del. C.* § 220 ("Section 220") to inspect certain of the Company's books and records related to the Company's account cancellations, including the accounting for, the disclosure of, and the metric used for such cancellations (the "220 Demand"). After negotiations regarding the validity and scope of the 220 Demand, Sunrun agreed to produce documents to Plaintiff Olsen pending the execution of a confidentiality agreement. On October 9, 2017, the parties executed a confidentiality agreement, and on October 30, 2017, Plaintiff Olsen received a production of documents from Sunrun (the "220 Documents").

After reviewing the 220 Documents, on April 5, 2018, Plaintiff Olsen filed *Olsen v. Sunrun Inc. et al.*, Case No. 1:18-cv-00516-VAC-CJB (the "*Olsen* Action"), in the United States District Court for the District of Delaware, against certain of the Company's directors and officers and on behalf of the Company. The complaint alleged that the defendants breached their fiduciary duties and violated Section 14(a) of the Exchange Act in connection with public statements made between September 16, 2015, and May 21, 2017, regarding the Company's cancellation rate and the incorporation of these cancellations into its performance metrics.

After filing the *Olsen* complaint, Plaintiff Olsen and Derivative Defendants agreed to multiple extensions of Derivative Defendants' time to respond to the *Olsen* complaint as the parties attempted to resolve the matter by settlement. The parties executed a stipulation of settlement on April 15, 2019,[4] and for purposes of settlement, the Settling Parties transferred the *Olsen* Action to this Court. The Court subsequently consolidated the *Sklar* and *Olsen* Actions on April 30, 2019. Dkt. No. 27.

---

[4] The Stipulation, which is dated September 5, 2019, supersedes and replaces in its entirety the Stipulation and Agreement of Settlement, dated April 15, 2019.

### 3.    Settlement Negotiations in the Derivative Actions

Counsel for Derivative Defendants and for Derivative Plaintiffs engaged in extensive arm's-length discussions and negotiations, both telephonically and in writing, before agreeing to the corporate governance reforms contained in the Settlement. Hynes Decl., ¶ 22. In September 2018, the Settling Parties began to explore a possible resolution of the Derivative Actions, and on October 2, 2018, the Derivative Plaintiffs sent Derivative Defendants a settlement demand. *Id.* at ¶ 23. Over the next three months, the Settling Parties engaged in numerous negotiations over the exact terms of a potential settlement, exchanging multiple versions of a proposed corporate governance term sheet, as well as holding numerous conference calls regarding the Company's existing governance structure and necessary governance enhancements for any settlement. *Id.* at ¶ 24. After months of hard-fought, intense negotiations, the Settling Parties reached an agreement to settle the Derivative Actions upon the terms and subject to the conditions set forth in the Stipulation. *Id.* As a result of the agreement, the Settling Parties moved to stay all proceedings in the Derivative Actions, except for settlement-related proceedings, pending final approval of the Settlement by the Court.

### C.    Preliminary Approval and Notice to Shareholders

On September 16, 2019, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order"). Dkt. No. 39. Pursuant to the terms of the Preliminary Approval Order, Sunrun published a copy of the Notice in the *Investors' Business Daily* on September 26, 2019. The Notice contained a detailed history of the Derivative Actions and proposed Settlement, the claims that will be released if the proposed Settlement is approved, and the agreed Fee and Expense Award to be paid to Derivative Plaintiffs' Counsel upon Court approval. The Notice, together with links to the Stipulation and the exhibits to the Stipulation, were also posted on the investor relations section of Sunrun's corporate website. Pursuant to the Preliminary Approval Order, the Notice directed that any objections to the

Settlement be filed by November 7, 2019. Not one Current Sunrun Stockholder has objected to the Settlement or the Fee and Expense Award. Hynes Decl., ¶ 29.

## III. BENEFITS OF THE PROPOSED SETTLEMENT

The Settlement addresses the core concerns raised in the Derivative Actions and offers Sunrun and Current Sunrun Stockholders the benefit of substantial, immediate, and lasting corporate governance reforms that provide for significant improvements to the effectiveness of the Sunrun Board by strengthening the Board's oversight over the Company's performance, prospects, and importantly, its customer satisfaction. *See id*. at ¶ 30; *see also* Stip. at § V(2.1). Derivative Plaintiffs alleged that Defendants caused the Company to "defer" customer cancellation figures and issued false and misleading statements in connection therewith. Hynes Decl., ¶ 31. The corporate governance reforms specifically address these allegations by strengthening the Company's internal controls with regard to the Board's oversight of Sunrun's performance and customer experience, giving the Board more accountability over Sunrun's performance metrics than before. *Id*. at ¶ 32. These measures will help prevent and deter the recurrence of the alleged misconduct in the Derivative Actions. *Id*. The Settlement is also comprised of corporate governance reforms that require self-evaluation and diversity protocols for directors, all of which result in a more independent and well-informed Board. *Id.* at ¶ 33.

The Settlement requires Sunrun to implement measures to ensure that the Board has a direct line of communication to senior management, who are the ones directly overseeing Sunrun managers and their interaction with Sunrun customers. Hynes Decl., ¶ 34; *see* Stip. at § V(2.1)(2). The required periodic reporting of the customer experience by a member of the Company's executive team to the Board goes to the heart of the allegations in the Derivative Actions, and ensures the Board's devoted attention to the vital issue of customer experience, a key factor in the Company delivering top-quality customer service. Hynes Decl., at ¶ 34. Importantly, the obligatory reporting of customer experience between the Board and senior management will allow the Company to take action if they notice an increase in customer cancellations and/or if the amount of

customer cancellations does not align with the information on customer experience. *Id.* at ¶ 35. Additionally, the Settlement requires the Board to continue to have a minimum of four meetings a year, which guarantees regular communication between the members of the Sunrun Board. Hynes Decl., ¶ 36; Stip. at § V(2.1)(1). Furthermore, the requirement for independent directors to have "closed sessions" at every regularly scheduled Board meeting at which management directors are not present, empowers non-management directors to serve as a more effective check on management. Hynes Decl., ¶ 37; Stip. at § V(2.1)(6). Executive sessions allow the Board's independent directors to freely discuss and react to management reports or proposals without concern for how management will react. Hynes Decl., ¶ 37. These sessions allow independent directors to independently reach consensus on matters, including whether to challenge senior management on a particular matter. *Id.* The executive sessions will allow the Company's independent directors to take steps to confront or prevent risky business practices of management. *Id.*

The reforms are also designed to strengthen the effectiveness of Sunrun's Board. For instance, the Settlement mandates the requirement that the Company include "diversity" among the factors considered when evaluating potential candidates to fill Board vacancies. Stip. at § V(2.1)(3). This reform will minimize the potential for a viewpoint or background to dominate the Board by assuring that the Board is instead comprised of individuals with differing insights and experiences which allow for robust discussions and well-rounded decision-making. Hynes Decl., ¶ 38. This will also help the Board's ability to relate to its customers who come from all different backgrounds and cultures. *Id.*

Furthermore, Sunrun must implement a governance measure mandating that the Nominating and Corporate Governance ("N&CG") Committee Charter be amended to provide that the N&CG Committee will evaluate the participation of Board members in orientation and continuing education activities in accordance with applicable listing standards and the Company's Corporate Governance Guidelines. Stip. at § V(2.1)(4). The N&CG Committee Charter shall also

be amended to provide that the findings of the N&CG Committee's annual corporate governance evaluation be reviewed with the full Board. Stip. at § V(2.1)(5). These measures help make the Board more knowledgeable by ensuring the directors are keeping abreast of the latest corporate governance developments, and are more accountable by requiring that the Board is evaluated annually to determine whether it and its committees are functioning successfully. Hynes Decl., ¶ 40. This results in speedier changes to the Board and/or its committees to ensure its success if problems are identified. *Id.*

Sunrun must maintain these requirements for a minimum of five years following the Settlement's Effective Date. Hynes Decl., ¶ 41. The five-year commitment term helps ensure Sunrun's compliance with the Settlement's directives, protects against dilution or discontinuance of these measures, and ensures that these practices and principles become embedded in Sunrun's corporate culture and practices.[5] *Id.* The five-year term provides ample time for the reforms to become embedded in Sunrun's regular practices and to foster a more transparent and shareholder-centric corporate culture. *Id.*

Taken together, the agreed-to reforms will enhance shareholder value by improving decision-making, communications, and Board oversight of core operations, and enhancing investor confidence in the Company. *Id.* at ¶ 42.

## IV. THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE SETTLEMENTS

It is well-settled that compromises of disputed claims are favored by the courts. *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement process [is] favored in the law"); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) (explaining that "there is an overriding public interest in settling and quieting

---

[5] *See, e.g., Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (a commitment to maintain corporate governance measures for a set time frame will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

litigation"). Further, "[s]ettlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" *Maher*, 714 F.2d at 455 (citation omitted); *NVIDIA*, 2008 U.S. Dist. LEXIS 117351, at *7; *see also In re Xoma Corp. Sec. Litig.*, No. C-91-2252 TEH, 1992 U.S. Dist. LEXIS 10502, at *3-4 (N.D. Cal. July 10, 1992) ("The law favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").

Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). While the district court must exercise "sound discretion" in evaluating a settlement, in exercising its discretion "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625; *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995) (upholding district court's determination that shareholder derivative settlement was "'fair, reasonable and adequate to [the company]'"). In determining whether a settlement is fair, reasonable, and adequate, courts consider the following factors: (i) the benefits conferred on the corporation; (ii) the risks, costs, and delays of continued litigation; (iii) the stage of proceedings; (iv) whether the settlement is the product of arm's-length negotiations by experienced counsel; and (v) the reaction of shareholders to the proposed settlement. *See Officers for Justice*, 688 F.2d at 625. As discussed below, each of these factors supports final approval of the Settlement.

## V. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND WARRANTS FINAL APPROVAL

### A. The Substantial Benefits Conferred on the Company

The "principal factor" in determining whether to approve the settlement of a shareholder derivative action "is the benefit to [the company] as compared to the risks" of continued litigation.

*In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195, at *8 (N.D. Cal. Nov. 5, 2008). Corporate governance reforms that "serve to prevent and protect [the company] from the reoccurrence of" alleged wrongdoing that resulted in material harm to the corporation confer a substantial benefit on the corporation and its shareholders that warrants settlement approval. *Unite Nat'l Ret. Fund v. Watts*, C.A. No. 04-CV-3606 (DMC), 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 27, 2005).

The Settlement achieves for Sunrun and Current Sunrun Stockholders the substantial benefit of numerous reforms that will materially improve the Company's corporate governance. *See* Stip., § V(2.1). These reforms are not only designed to address the governance shortcomings that Derivative Plaintiffs alleged led to the misconduct that is the subject of the Derivative Actions, but will also substantially strengthen the Board's oversight over the Company's performance, prospects, and importantly, its customer satisfaction. These reforms will provide substantial, long-term benefits to Sunrun and Current Sunrun Stockholders.

### B.     The Risks, Costs and Delays of Continued Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, the Court should balance the benefits of the settlement against the continuing risks of litigation. *Officers for Justice*, 688 F.2d at 625. There is no question that derivative actions are fraught with risk. Indeed, the Ninth Circuit has held that "the odds of winning [a] derivative lawsuit [are] extremely small." *In re Pac. Enters.*, 47 F.3d at 378. Here, weighed against the substantial risk that continued litigation would yield no benefit, the Settlement's guaranteed and immediate benefits are plainly fair, reasonable, and adequate.

While Derivative Plaintiffs continue to believe in the strength of their breach of fiduciary duty claims, Derivative Plaintiffs also recognize the considerable challenges they would face in establishing liability for these claims. Derivative Plaintiffs' Counsel have also taken into account the uncertain outcome and the risk of any litigation, especially in complex cases such as the Derivative Actions, as well as the difficulties and delays inherent in such litigation. Hynes Decl.,

¶ 54. Derivative Plaintiffs' Counsel are also mindful of the inherent problems of establishing demand futility, and the possible defenses to the claims alleged in the Derivative Actions, even with the benefit of the 220 Documents. *Id*. at ¶ 55.

Moreover, at the time of the filing of the Derivative Actions, the value of Derivative Plaintiffs' claims was significantly higher than at the time of settlement negotiations because, at the time of filing, Derivative Plaintiffs alleged that the Company was facing both the Securities Class Action and an U.S. Securities and Exchange Act ("SEC") investigation into the activities complained of in the complaints. *Id.* at ¶ 56. Derivative Plaintiffs are mindful of the fact that, while the Derivative Actions are independent of and different from the Securities Class Action, there exists substantial overlap between the respective cases in terms of factual allegations challenging certain statements made by Derivative Defendants. *Id.* at ¶ 57. At the time Derivative Plaintiffs negotiated the Settlement, the Court had twice granted defendants' motion to dismiss the Securities Class Action. *Id.* at ¶ 58. While the plaintiffs in the Securities Class Action originally estimated damages in the case to range anywhere from approximately $12.7 million to $34.4 million,[6] the Securities Class Action eventually settled for, with the Court's approval, a $2.5 million cash settlement entered by the parties thereto to be paid entirely by insurance proceeds for a release of claims.[7] The settlement in the Securities Class Action also contained a provision for denial of fault, wrongdoing, and liability by the defendants. The fact that the Court twice dismissed as inactionable the statements in the Securities Class Action posed a uniquely difficult litigation risk for Derivative Plaintiffs if the Derivative Actions had proceeded. Hynes Decl., ¶ 59. The Settlement eliminates these and other risks of continued litigation, including the very real risk of

---

[6] *See* Memorandum of Law in Support of Lead Plaintiffs' Unopposed Motion for Entry of Order Preliminary Approving Settlement and Providing Notice at 14 (Dkt. No. 101) in the Securities Class Action.

[7] According to a December 14, 2018 *SeekingAlpha* report concerning the SEC investigation, the U.S. Attorney "declined prosecution of the matter based on the information we have at present."

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

no recovery for Sunrun after years of additional litigation, while ensuring that the Company and Current Sunrun Stockholders obtain immediate benefits. *Id.* at ¶ 60.

In addition, Derivative Defendants undoubtedly would argue that Derivative Plaintiffs must prove by preponderance of evidence that each of the Individual Defendants acted in bad faith. Should the Court agree, this would present considerable challenges in establishing liability at trial. Derivative Plaintiffs are also mindful of the challenge of proving demand futility at trial. Furthermore, the Individual Defendants have denied and continue to deny each and all of the claims and allegations of wrongdoing made by Derivative Plaintiffs in the Derivative Actions. Stip., § IV. If the Settling Parties continued with the litigation, the Individual Defendants would likely continue to assert that their conduct was protected by the business judgment rule, which creates the powerful presumption that the Board and management acted in the best interests of the Company. *Id.* The possibility that this protective umbrella could have shielded the Individual Defendants made establishing liability in the Derivative Actions uncertain, at best.

Even assuming that liability could eventually be established, it is not clear or certain what amount of damages or corporate governance reforms Derivative Plaintiffs could recover on behalf of Sunrun at trial. Derivative Defendants would undoubtedly argue that the directors are exculpated from liability by virtue of the exculpatory clause in Sunrun's Certificate of Incorporation, permissible under 8 Delaware Code Annotated § 102(b)(7). *See Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 799 (Del. Ch. 2004). Under traditional applications of Delaware law, Derivative Plaintiffs faced a formidable challenge establishing and collecting monetary damages in the Derivative Actions. While Sunrun may have suffered losses as a result of the conduct challenged in the Derivative Actions, the question of whether it suffered legal, non-exculpated damages is a much more complicated question.

Moreover, the issue of damages to Sunrun would have been hotly disputed and clearly would have been the subject of expert testimony proffered by all parties.[8] The damages assessments of experts retained by the parties would surely vary substantially, and the assessment of this crucial element of Derivative Plaintiffs' claims would likely be reduced at trial to a "battle of the experts." *See, e.g.*, *In re Emerging Commc'ns S'holders Litig.*, C.A. No. 16415, 2004 Del. Ch. LEXIS 70, at *40 (Del. Ch. May 3, 2004). It is far from certain that a jury would have disregarded Derivative Defendants' experts' opinions. Indeed, defense experts seeking to establish that damages were caused by factors other than Derivative Defendants' wrongdoing, or, alternatively, trying to minimize the amount of the Company's damages might very well sway a jury. *See, e.g., In re PaineWebber P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997). Conceivably, a jury could find that there were no damages at all, or that damages were a fraction of the amount asserted by Derivative Plaintiffs.

In addition to the risks inherent in proceeding, the expense and likely duration of the Derivative Actions would eventually yield diminishing returns for the Company. Discovery would be substantial and costly on all sides, likely resulting in protracted motion practice followed by a trial occupying the Court, Settling Parties, witnesses, and attorneys on both sides for a lengthy duration. Hynes Decl., ¶ 65. A prolonged period of pre-trial proceedings and a lengthy and uncertain trial would not serve the interests of the Company and Current Sunrun Stockholders, particularly in light of the benefits provided by the Settlement. *Id.* at ¶ 66. Further, even if Derivative Plaintiffs obtained a judgment favorable to the Company, it would likely be the subject of post-trial motions and appeal, which could prolong the Derivative Actions even further. *Id.* at

---

[8] *See In re Lloyd's Am. Tr. Fund Litig.*, 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable.").

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

¶ 67. Thus, the prospect of continued protracted, expensive, and uncertain litigation strongly supports approval of the Settlement.

## C. The Extent of Discovery and Stage of the Proceedings

Courts also consider the extent of discovery completed and the stage of the proceedings together as one factor in determining the fairness, reasonableness, and adequacy of the proposed Settlement. *Officers for Justice*, 688 F.2d at 625; *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 626-17 (N.D. Cal. 1979). The Ninth Circuit has noted that "'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citations omitted).[9]

Here, the Settlement was negotiated only after Derivative Plaintiffs' Counsel conducted an investigation into Derivative Plaintiffs' factual allegations and legal claims, and after posturing the case in the best possible stage for efficient resolution of the claims, including: (i) reviewing Sunrun's press releases, public statements, SEC filings, and securities analysts' reports and advisories about the Company; (ii) reviewing media reports about the Company; (iii) researching the applicable law with respect to the claims alleged in the Derivative Actions and the potential defenses thereto; (iv) preparing a Section 220 Demand for relevant books and records of Sunrun; (v) reviewing the 220 Documents produced by the Company in response to the Section 220 Demand; (vi) preparing and filing stockholder derivative complaints, one of which included allegations based upon the 220 Documents; (vii) participating in informal conferences with Derivative Defendants' Counsel regarding the specific facts of the cases, the perceived strengths and weaknesses of the cases, and other issues in an effort to facilitate negotiations and fact

---

[9] *See also Sved v. Chadwick*, 783 F. Supp. 2d 851, 861 (N.D. Tex. 2009) (Courts "look[] not to the amount of discovery, but rather to 'whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settl[ement.]'") (citation omitted).

gathering; (viii) reviewing and analyzing relevant documents and pleadings in the Securities Class Action, including, but not limited to, two (2) amended complaints and the granting, by this Court, of Defendants' two (2) motions to dismiss, respectively; (ix) preparing a settlement demand; and (x) negotiating the Settlement with Derivative Defendants for approximately three months. Hynes Decl., ¶ 70.

The accumulation of the information discovered through the above efforts permitted Derivative Plaintiffs and Derivative Plaintiffs' Counsel to be well-informed about the strengths and weaknesses of their case and to engage in effective settlement discussions with Derivative Defendants. Hynes Decl., ¶ 71. Therefore, this factor also favors approval of the Settlement.

### D. The Settlement Was Negotiated At Arm's-Length By Experienced Counsel

A settlement enjoys a presumption of fairness if it "'is recommended by . . . counsel after arm's-length bargaining.'" *Villanueva v. Morpho Detection, Inc*., No. 13-cv-05390-HSG, 2015 U.S. Dist. LEXIS 106183, at *14 (N.D. Cal. Aug. 12, 2015) (citation omitted). Such a presumption applies here because the Settlement is the product of arm's-length negotiations conducted by experienced counsel knowledgeable in complex shareholder derivative litigation. Hynes Decl., ¶ 72. These negotiations lasted approximately three months and included multiple revisions to a corporate governance term sheet, as well as numerous conference calls regarding the Company's existing governance structure and necessary governance enhancements for any settlement. *Id*.

All counsel possessed a firm understanding of the strengths and weaknesses of their respective claims and defenses. In particular, Derivative Plaintiffs and Derivative Plaintiffs' Counsel have engaged in extensive investigation and other litigation efforts throughout the prosecution of the Derivative Actions and have accumulated sufficient information discovered through these efforts to be well-informed about the strengths and weaknesses of their case and to engage in effective settlement discussions with Derivative Defendants. *See* Hynes Decl., ¶ 74. Courts accord "considerable weight" to the recommendation of experienced counsel. *Hughes v. Microsoft Corp.*, No. C98-1646C, 2001 U.S. Dist. LEXIS 5976, at *21 (W.D. Wash. Mar. 21,

16

2001) ("[C]ounsel's opinion is accorded considerable weight and supports the fairness and adequacy of the proposed settlement."). Derivative Plaintiffs' Counsel has litigated scores of shareholder derivative actions to successful resolution and its lawyers are nationally recognized as leaders in the field of shareholder rights litigation.[10] Hynes Decl., ¶ 75. Fenwick & West, LLP, a nationally recognized corporate defense firm, represents Derivative Defendants and also served as defense counsel in the Securities Class Action. *Id.* at ¶ 76. The Settling Parties' lengthy, hard-fought negotiation history demonstrates that the Settlement was the product of arm's-length negotiations. *Id.* Thus, the Settlement enjoys a presumption of fairness.[11]

## VI. THE NEGOTIATED FEE AND EXPENSE AWARD IS FAIR AND REASONABLE AND SHOULD BE APPROVED

### A. Courts Favor a Negotiated Resolution of Fee Issues

The United States Supreme Court has encouraged a consensual resolution of attorneys' fee awards as the ideal toward which litigants should strive. In *Hensley v. Eckerhart*, the Supreme Court said that a "request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." 461 U.S. 424, 437 (1983). Thus, a negotiated fee is entitled to substantial weight and deference, absent evidence of collusion. *See Cohn*, 375 F.

---

[10] The firm résumés of each of Derivative Plaintiffs' Counsel are attached as Exhibit A to their respective fee declarations filed on behalf of each of their firms and attached as Exhibits 2-4 to the Hynes Declaration.

[11] "A[nother] . . . factor to consider in evaluating a proposed derivative settlement is shareholder opposition." *Apple,* 2008 U.S. Dist. LEXIS 108195, at *12. Having received adequate notice of the Settlement, *see* Section II.C, *supra*, no Current Sunrun Stockholder has served Derivative Plaintiffs' Counsel with an objection to the Settlement (including the Fee and Expense Award and Incentive Awards) or notified Derivative Plaintiffs' Counsel of their intention to appear at the Settlement Hearing. *See* Hynes Decl., ¶¶ 7, 29. The absence of objections to the proposed Settlement from Current Sunrun Stockholders strongly supports final approval of the Settlement. *See, e.g., Roberti v. OSI Sys.*, No. CV-13-09174 MWF (MRW), 2015 U.S. Dist. LEXIS 164312, at *16 (C.D. Cal. Dec. 8, 2015) ("By any standard, the lack of objection favors final approval."); *In re MRV Commc'ns, Inc., Derivative Litig.*, No. CV 08-03800 GAF (MANx), 2013 U.S. Dist. LEXIS 86295, at *16-17 (C.D. Cal. June 6, 2013) (approving settlement of derivative action where "Plaintiffs [were] not aware of a single objection to any aspect of the Settlement.") (citation and quotation omitted).

---

17

Supp. 2d at 861 ("[W]here, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference."); *see also Pac. Enter.*, 47 F.3d at 378 (Significant weight should be attributed to the parties' belief that the litigation should be settled on the proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."). This is particularly so in derivative actions, where, as here, companies and the individual defendants frequently have experienced counsel to negotiate the amount of fees to be paid to counsel for plaintiffs.

Here, the Settling Parties negotiated the amount of fees and expenses at arm's-length after reaching agreement on the substantive terms of the Settlement. Hynes Decl., ¶ 78. During multiple telephonic conferences, the Settling Parties negotiated for an amount of attorneys' fees and expenses that each party believed was fair and reasonable based on the complexity of the Derivative Actions, and the terms and benefits of the Settlement. *Id.*

Derivative Plaintiffs' Counsel agreed to the Fee and Expense Award only after they had considered, *inter alia*, the respective valuations of the benefits to be conferred upon Sunrun as a result of the Derivative Actions and Settlement, the attorney fee provisions approved by courts in similar shareholder derivative action settlements, and the amount which would fairly compensate Derivative Plaintiffs' Counsel for both the risk they undertook in commencing the Derivative Actions, and the results they produced in prosecuting and settling the Derivative Actions. *Id.* at ¶ 79. The end result of these negotiations is a market-driven, arm's-length Fee and Expense Award that should be approved. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (noting that market factors, best known by the negotiating parties themselves, should determine the quantum of attorneys' fees).

The Settling Parties' agreement on the fee award accords with Ninth Circuit law, which considers the following factors when determining the reasonableness of attorneys' fees: (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the

contingent nature of the fee; (5) the burdens carried by plaintiffs' counsel; and (6) the awards made in similar cases.[12] *See MRV*, 2013 U.S. Dist. LEXIS 86295, at *18. As set forth below, the Fee and Expense Award is reasonable and appropriate in light of the factors the Ninth Circuit traditionally considers in determining reasonable fee awards.

**B.      The Agreed-to Fee Award Is Fair and Reasonable in Light of the Substantial Benefits Achieved and Awards in Similar Cases**

Under the "substantial benefit" doctrine, counsel who prosecute a shareholders' derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970); *Cohn*, 375 F. Supp. 2d at 866 ("This Court believes that because of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorney's fees awarded should reflect this goal."). As the Supreme Court stated in *Mills*, "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." 396 U.S. at 395-96 (citations omitted); *accord Maher*, 714 F.2d at 461.

As described above, the Settlement consideration consists of corporate governance reforms designed to provide substantial, immediate, and long-lasting benefits to Sunrun and Current Sunrun Stockholders. Courts around the country, including the Supreme Court, have long recognized that settlements of derivative actions based on non-monetary corporate therapeutics,

---

[12] Delaware courts use similar factors: "(1) the results accomplished for the benefit of the shareholders; (2) the efforts of counsel and the time spent on the case; (3) the contingent nature of the fee; (4) the difficulty of the litigation; and (5) the standing and ability of counsel involved." *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002) (*citing Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980)).

such as material changes in corporate management or policies, provide substantial benefits and warrant approval. *See, e.g., Mills*, 396 U.S. at 396-97; *NVIDIA*, 2008 U.S. Dist. LEXIS 117351, at *10 ("[S]trong corporate governance is fundamental to the economic well-being and success of a corporation."); *Cohn*, 375 F. Supp. 2d at 853 ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."); *In re Rambus Inc. Derivative Litig.*, No. C 06-3513 JF (HRL), 2009 U.S. Dist. LEXIS 131845, at *11 (N.D. Cal. Jan. 20, 2009) ("Following *Mills,* courts consistently have approved attorneys' fees and expenses in shareholder actions where the plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief.").

As described above, the corporate governance reforms in the Settlement provide a direct and tangible benefit to Sunrun aimed specifically at preventing a recurrence of the misconduct alleged in the Derivative Actions.[13] Hynes Decl., ¶ 82. The Settlement also provides for significant reforms to Sunrun's overall corporate governance practices, including reforms at both the Board and senior management level, which will improve the internal communication structure at Sunrun. *Id.* at ¶ 83. Derivative Defendants acknowledge that the initiation and prosecution of the Derivative Actions and discussions with Derivative Plaintiffs' Counsel were a material cause of the adoption and implementation of the valuable governance reforms comprised in the Settlement and that such reforms confer a substantial benefit on the Company. *See* Stip., §§ IV, VI. In short, these substantial benefits to Sunrun and Current Sunrun Stockholders and Derivative Plaintiffs' Counsel's singular role in securing them, strongly support approval of the agreed upon Fee and Expense Award.

---

[13] In the oft-cited *Chrysler Corp. v. Dann*, 223 A.2d 384 (Del. 1966), the Delaware Supreme Court held that changes in corporate policy or a heightened level of protection for stockholders justifies an award of counsel fees. *Id.* at 386; *see also Seinfeld v. Robinson*, 246 A.D.2d 291, 298 (N.Y. App. 1st Dep't 1998) (awarding fees in a derivative action which resulted in the corporation "implementing procedures that will prevent the exact sequence of events from reoccurring, [therefore] plaintiffs have furnished a benefit to all shareholders").

Moreover, the proposed Fee and Expense Award compares more than favorably with amounts awarded in similar derivative actions. *See, e.g., Rambus*, 2009 U.S. Dist. LEXIS 131845 (awarding $2 million in attorneys' fees for settlement of shareholder derivative actions consisting of corporate governance reforms and no monetary contribution); *Wilfred v. Modany, et al.*, C.A. No. 13-cv-3110 (S.D.N.Y. May 8, 2013) (awarding $1.1 million fee in settlement of shareholder derivative actions involving corporate governance enhancements and no monetary payment) (Hynes Decl., Ex. 5).[14]

### C. The Risks of Litigation

As discussed in Section V.B, *supra*, pursuing this litigation is inherently risky as "derivative lawsuits are rarely successful." Accordingly, for the reasons stated above, this factor supports the reasonableness of the unopposed Fee and Expense Award.

### D. The Skill Required and the Quality of Work

The skill required by Derivative Plaintiffs' Counsel to prosecute and settle the Derivative Actions and their quality of work are additional factors that support Derivative Plaintiffs' requested Fee and Expense Award. *See MRV*, 2013 U.S. Dist. LEXIS 86295, at *19 (approving

---

[14] *See also Krantz v. Ryan, et al.*, No. 1:01-cv-11464 (D. Mass. Sept. 7, 2005) (awarding $750,000 fee in settlement of shareholder derivative action involving corporate governance enhancements and no monetary payment) (Hynes Decl., Ex. 6); *In re Biopure Corp. Derivative Litig.*, No. 1:04-cv-10177 (D. Mass. Sept. 15, 2009) (awarding $600,000 fee in settlement of shareholder derivative action involving corporate governance enhancements and no monetary payment) (Hynes Decl., Ex. 7); *Williams v. Nuti, et al.*, No. 1:13-cv-01400-SCJ (N.D. Ga. Apr. 8, 2014) (awarding $500,000 fee in settlement of shareholder derivative action involving a number of enhancements to the company's corporate compliance program and no monetary payment) (Hynes Decl., Ex. 8); *Tharp v. Acacia Commc'ns, Inc., et al.*, No. 1:17-cv-11504 (D. Mass. Jan. 23, 2019) (awarding $690,633 fee and $34,367 in expenses in settlement of shareholder derivative action involving corporate governance enhancements and no monetary payment) (Hynes Decl., Ex. 9); *Bushansky v. Carlucci, et al.*, No. 1:17-cv-12091 (D. Mass. Jan. 24, 2019) (awarding $350,000 fee in settlement of shareholder derivative action involving corporate governance enhancements) (Hynes Decl., Ex. 10); *Salley v. Debrabandere, et al.*, No. 17-cv-03777 (D. Md. Feb. 1, 2019) (awarding $900,000 fee in settlement of shareholder derivative action involving corporate governance enhancements and no monetary payment) (Hynes Decl., Ex. 11).

unopposed fee and finding that "the successful prosecution of this action required knowledge and expertise in the fields of shareholder derivative litigation . . . .). Derivative Plaintiffs' Counsel are nationally recognized law firms that specialize in shareholder derivative litigation. *See* Hynes Decl., ¶ 86, & Exs. 2, 3 & 4. Here, Derivative Plaintiffs' Counsel provided extensive, high-quality representation throughout the pendency of the Derivative Actions. As stated *supra*, Derivative Plaintiffs' Counsel expended significant time prosecuting and negotiating the Settlement of the Derivative Action. *See* Section V.C., *supra*; Hynes Decl., ¶ 87. The quality of Derivative Plaintiffs' Counsel and their efforts throughout the Derivative Actions demonstrate that the Fee and Expense Award should be approved. *See In re Del Monte Foods Co. S'holders Litig.*, C.A. No. 6027-VCL, 2011 Del. Ch. LEXIS 94, at *38 (Del. Ch. June 27, 2011) ("More important than hours is effort, as in what plaintiffs' counsel actually did.") (citation and quotation omitted).

### E. The Contingent Nature of the Fee and Burdens on Derivative Plaintiffs' Counsel

Derivative Plaintiffs' Counsel undertook the litigation of the Derivative Action with the expectation that they would have to devote many hours of hard work to the prosecution of a case involving complex factual and legal issues without any guarantee of successful resolution or of compensation for their efforts. *See* Hynes Decl., ¶ 88. Derivative Plaintiffs' Counsel diligently investigated the claims, commenced litigation of the Derivative Actions, pursued the interests of their clients and nominal defendant Sunrun, and successfully brought the Derivative Actions to an amicable resolution. *Id*. at ¶ 89. The prosecution of the Derivative Actions involved the expenditure of significant resources, including the time spent by attorneys and professional staff, as well as the substantial expenses that were incurred during the litigation, for which Derivative Plaintiffs' Counsel received no compensation during the course of litigation. *Id*. at ¶ 90.

Accordingly, the contingent nature of Derivative Plaintiffs' Counsel's representation fully supports the requested Fee and Expense Award.[15]

### F. A Lodestar Cross-Check Confirms the Reasonableness of the Unopposed Fee and Expense Award

A so-called "lodestar cross-check" also supports the reasonableness of the unopposed Fee and Expense Award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 & App. (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").[16] A lodestar cross-check is calculated by multiplying the time spent by the reasonable hourly rate of each attorney and staff member involved in the case. Here, Derivative Plaintiffs' Counsel expended 386.75 hours and incurred $255,117.50 in lodestar during the successful prosecution of the Derivative Actions.[17] *See* Hynes Decl., ¶ 92, Exs. 2-4. The hours reported by Derivative Plaintiffs' Counsel exclude time spent preparing the briefing and accompanying declarations in support of preliminary and final settlement approval. Plaintiffs' Counsel also incurred $9,675.85 in unreimbursed expenses in connection with the litigation of the Derivative Actions. *Id.* at ¶ 93. After subtracting Derivative

---

[15] *See MRV*, 2013 U.S. Dist. LEXIS 86295, at *19 ("the fifth factor is clearly satisfied here as well, as '[t]he litigation was undertaken by Plaintiffs' Counsel on a wholly contingent basis' with the understanding that 'they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case required.'") (citations omitted).

[16] "In contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours." *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 U.S. Dist. LEXIS 27269, at *15 (N.D. Cal. Mar. 28, 2007).

[17] In addition, the hourly rates charged by Derivative Plaintiff's Counsel are unquestionably reasonable. *See Roberti*, 2015 U.S. Dist. LEXIS 164312, at *19-20 ("Lead Counsel's attorney rates – between $525 to $975 – are reasonable given that each has at least 15 years of litigation experience (upwards of over 40 years of litigation experience), with the exception of . . . the day-to-day litigation associate."); *Seinfeld v. Coker*, 847 A.2d 330, 337-38 (Del. Ch. 2000) (awarding fee amounting to more than $1,300 per hour where the litigation was not hard fought, expedited proceedings were not sought, and no motion practice occurred).

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC

Plaintiffs' Counsel's expenses, the requested Fee and Expense Award represents a lodestar of 1.06. *Id.* Considering that the multiplier is 1.06, it is wholly reasonable under Ninth Circuit law, which holds that lodestar multipliers can range from two to four or even higher. *See, e.g., Vizcaino*, 290 F.3d at 1052 & App. (affirming fee award equal to lodestar multiplier of 3.65, and listing 23 settlements and multipliers for each where the average multiplier is 3.28).[18] Accordingly, the lodestar "cross-check" confirms that the unopposed Fee and Expense Award is fair and reasonable compensation for the time and labor Derivative Plaintiffs' Counsel expended in achieving the benefits of the Settlement.

## VII. THE INCENTIVE AWARDS SHOULD BE APPROVED

"Incentive awards are payments to class representatives for their service . . . in bringing the lawsuit." *Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372-SI, 2014 U.S. Dist. LEXIS 130903, at *30 (D. Or. Sept. 18, 2014). Service awards for plaintiffs in derivative actions are routinely awarded. "Such awards are granted to reward the public service performed by . . . plaintiffs in contributing to the vitality and enforcement of securities laws." *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving a $25,000 incentive award). Where, as here, the incentive award is to be paid from the Fee and Expense Award, it "need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *Id.* Here, as provided for in the Stipulation, Plaintiff Sklar and Plaintiff Olsen may apply for incentive awards of $1,000 each, to be paid from the Fee and Expense Award. *See* Stip. § V(5.5). The Settlement would not have been achieved but for the participation of the Derivative

---

[18] *See also Buccallato v. AT&T Operations, Inc.*, No. C10-00463-LHK, 2011 U.S. Dist. LEXIS 85699, at *4 (N.D. Cal. June 30, 2011) (approving 4.3 lodestar multiplier and listing cases approving multipliers ranging from 4.3 to 9.3); *Steiner v. Am. Broad. Co.*, 248 Fed. App'x 780, 783 (9th Cir. 2007) (affirming award with multiplier of 6.85); *Destefano v. Zynga, Inc.*, No. 12-cv-04007-JSC, 2016 U.S. Dist. LEXIS 17196, at *69 (N.D. Cal. Feb. 11, 2016)("Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases.") (citation and quotation omitted).

Plaintiffs. By taking action on behalf of Sunrun, the Derivative Plaintiffs have enhanced the corporate governance of the Company.

## VIII. CONCLUSION

For the foregoing reasons, Derivative Plaintiffs respectfully request that the Court approve the Settlement as fair, reasonable and adequate, approve the agreed-to Fee and Expense Award in the amount of $280,000 as fair and reasonable, and approve the Incentive Awards as fair and reasonable.

Dated: November 14, 2019                              **BRAGAR EAGEL & SQUIRE, P.C.**

By:     */s/ Melissa A. Fortunato*
Melissa A. Fortunato
101 California Street, Suite 2710
San Francisco, CA 94111
Telephone:  (415) 365-7149
Email:  fortunato@bespc.com

*Attorneys for Plaintiff Leonard Olsen*

PLAINTIFFS' NTC OF MTN AND UNOPPOSED MTN FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FEE AND EXPENSE AWARD AND MEMORANDUM IN SUPPORT THEREOF
CASE NO. 3:17-CV-3743-VC